**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**5:15-cv-102-FDW**

| | | |
|---|---|---|
| HENRY FORD ADKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| RICK JACKSON, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**THIS MATTER** comes before the Court on Motions for Summary Judgment filed by Defendant Vicki Coffey, (Doc. No. 102) and Defendants Herbert L. Jackson, Maria Oxford R.N, and Phillip Stover M.D., (Doc. No. 104). Also pending is Plaintiff's Motion to Compel Discovery, (Doc. No. 108).

## I.    BACKGROUND

*Pro se* Plaintiff's Amended Complaint passed initial review on claims that he received deliberately indifferent medical treatment for a cancerous ear at Brown Creek and Alexander Correctional Institutions. Defendants have now filed Motions for Summary Judgment.

**(1)    Amended Complaint** (Doc. No. 24)

Plaintiff alleges in his unverified Amended Complaint that he was assigned to Brown Creek C.I. in 2013 when a pre-cancer on his left ear ulcerated and became extremely painful and swollen. (Doc. No. 24 at 5). Plaintiff put in a number of sick call requests asking for treatment. A doctor at Brown Creek C.I. wrote a medical order for Plaintiff to be seen by a dermatologist, but Superintendent Jackson refused even though Jackson knew of Plaintiff's serious medical need.

1

(Id.). Nurse Oxford refused to make arrangements for proper treatment for Plaintiff in 2013 and 2014. (Doc. No. 24 at 5). When Brown Creek C.I. staff asked permission from the Utilization Review Board ("URB") to treat Plaintiff's cancerous ear, Dr. Stover refused. (Doc. No. 24 at 7).

Plaintiff was assigned to Alexander C.I. around September 2014, and his ear was treated with antibiotics, which did nothing to ease the pain or heal the ear lesion. Head Nurse Coffey delayed sending Plaintiff to a cancer specialist for several months which allowed the cancer to spread and endanger his life. (Doc. No. 24 at 10). After a year of waiting for treatment, most of his ear was surgically removed. (Doc. No. 24 at 5-6). The delay necessitated radiation therapy which caused loss of facial and head hair, teeth, and hearing. (Doc. No. 24 at 6).

Plaintiff seeks nominal, punitive, and compensatory damages. (Doc. No. 24 at 15).

**(2)    Defendant Coffey's Motion for Summary Judgment** (Doc. No. 102)

Plaintiff cannot show that Defendant Coffey was deliberately indifferent to a serious medical need as relates to a growth on his ear while he was at Alexander C.I. It is undisputed that Plaintiff suffers from basal cell cancer on his ear and suffered from a serious medical need. However, it is also undisputed that there is no evidence that Nurse Coffey disregarded any of the risks associated with Plaintiff's growth on his ear. Instead, the undisputed evidence demonstrates that Nurse Coffey sought all available requests for treatment from the NC Medical Utilization Review Board for Plaintiff throughout his incarceration at Alexander C.I., as requested and deemed necessary by the Alexander physicians, physicians' assistants, and third-party specialist providers that saw him. Nothing about the care Nurse Coffey provided is gross incompetence, inadequate or excessive risk to inmate health or safety. The medical records and affidavit of Nurse Coffey demonstrate that the care provided was adequate and above and beyond what was required in most instances. There is no proof that Nurse Coffey was negligent in the care she provided and,

even if a simple negligence standard applied Plaintiff's claim would fail because the undisputed evidence demonstrates that Nurse Coffey sought the care available to Plaintiff in treating the growth on his ear.

Sovereign immunity bars Plaintiff from receiving money damages against Defendant Coffey in her official capacity.

Qualified immunity shields Defendant Coffey in her individual capacity. It is undisputed that Nurse Coffey was acting on behalf of the government in providing medical treatment to Plaintiff. Plaintiff has not made out a violation of a clearly established right because he essentially takes issue with the method by which appointments and care had to be reviewed by the NC Medical Utilization Review Board prior to appointments being made for him to see a specialist. Further, the evidence shows that Defendant Coffey's actions were absolutely reasonable. Nurse Coffey's duties were to assess Plaintiff's medical complaints, perform nursing assessments, document nursing findings, make appropriate referrals to his treating physician, and follow the treating physician's orders. Nurse Coffey did not have the authority to make appointments based solely on Plaintiff's request. She had to send his requests through the appropriate channels and, once permission was given, the schedulers at Alexander C.I. contacted the providers and made appointments. Nurse Coffey's affidavit establishes that at all times, she was simply working within the standard of care for a nurse and the duties of a nurse, thereby surpassing the care required under the deliberate indifference standard. No constitutional violation has been shown and Nurse Coffey was reasonable and took part in no actions which were a known violation of the law. Therefore, Plaintiff's claims for monetary damages against Nurse Coffey in her individual capacity should be dismissed.

**(3)** **Defendants Jackson, Oxford, and Stover's Motion for Summary Judgment** (Doc. No.

The record establishes that Plaintiff's constitutional rights were not violated by Defendants and there is no evidence that Defendants were deliberately indifferent to Plaintiff's serious medical needs while he was at Brown Creek C.I. Defendant Jackson did not have any involvement in Plaintiff's medical treatment at Brown Creek C.I. and, as correctional staff, he would not be responsible for providing medical treatment to inmates. The medical evidence further demonstrates that Plaintiff received reasonable, timely, and appropriate medical treatment in accordance with NCDPS policies and procedures.

Defendant Stover's denial of a URB request for a dermatology consult was reasonable and did not amount to deliberate indifference. Plaintiff received a telemedicine consult on April 17, 2013 with Dr. Sarah Chisolm, Department of Dermatology at East Carolina University. She assessed Plaintiff with actinic keratosis on his right hand and seborrheic keratosis on his right chest which was benign. Dr. Chisolm did not note any skin abnormalities involving Plaintiff's left earlobe and Plaintiff did not voice any complaints about his earlobe at that time.

Less than one year later, Defendant Oxford submitted a request to the URB on March 12, 2014, for a dermatology consultation ordered by the medical provider at Brown Creek C.I., Dr. Hassan. In response to the URB request and as part of his duties as a Medical Consultant and UR review physician, Defendant Stover requested that photographs be taken of Plaintiff's left earlobe and be submitted. The photographs were posted on May 19, 2014. Based on his medical background, training, education, experience, and the information provided to him in the URB request, including photographs of the earlobe, Defendant Stover denied the request for a dermatology consultation. Defendant Stover assessed the earlobe as showing some mild acitinic keratosis and suggested treatment with Efudex. Defendant Stover is not aware of any other

interactions involving Plaintiff or the care and treatment of his earlobe, and Defendant Stover never clinically treated Plaintiff at any NCDPS facility.

The undisputed medical evidence shows that Plaintiff received continuous and appropriate medical treatment for his left earlobe. There is no evidence to show that Defendants' actions or inactions were so grossly incompetent, inadequate, or excessive as to shock the conscience to show deliberate indifference.

Plaintiff was provided appropriate medical treatment in accordance with NCDPS policies. Defendant Jackson did not have the authority to determine Plaintiff's course of medical treatment, overrule the medical opinions of healthcare providers, or subscribe Plaintiff medications. Defendants timely addressed Plaintiff's complaints and/or grievances when presented with them. Any claims that Defendants did not adequately respond to Plaintiff's grievances and complaints would also be without merit and does not create a material issue of fact about deliberately indifferent conduct. The record establishes that Defendants adequately, timely, and in good faith responded to Plaintiff's medical concerns.

To the extent that Plaintiff is alleging supervisory liability, this claim fails because § 1983 does not allow liability based on vicarious responsibility. The record establishes that Defendant Jackson did not supervise or have control over the medical staff at Brown C.I.  Further, he had no actual knowledge or direct involvement in Plaintiff's medical treatment. Non-medical correctional officials like Defendant Jackson are only allowed limited information regarding an inmate's health pursuant to HIPPA. The medical evidence shows that Plaintiff received adequate medical treatment. Therefore, the substantial evidence in the record shows that no reasonable juror could find Defendant Jackson liable under a theory of supervisory liability.

Defendants are entitled to qualified immunity. The record establishes that Defendants acted timely, reasonably, and appropriately with regards to Plaintiff's subjective medical needs.

Defendants are also entitled to summary judgment for any punitive damages claims. Plaintiff has failed to provide any evidence of Defendants' intent or motive and has provided nothing to show evil intent or callous indifference to his rights.

**(4)    Plaintiff's Responses**

Plaintiff was informed of the importance of responding to Defendants' motions as well as the legal standard applicable to summary judgment motions. See (Doc. No. 107).

**(A)    Defendant Coffey** (Doc. No. 110)

Plaintiff alleges that he was transferred to Brown Creek C.I. around August 15, 2013. Prior to the transfer, Plaintiff was being treated for pre-cancer on various parts of his upper body by using Flourouracil cream. After Plaintiff was transferred to Brown Creek, a pre-cancerous lesion developed on the top of Plaintiff's left ear. Plaintiff used the Flourouracil cream on the lesion. Defendant Coffey was deliberately indifferent by failing to take reasonable measures to abate the risk to Plaintiff's serious medical need. Defendants are not entitled to qualified immunity. During Plaintiff's time at Brown Creek, the lesion ulcerated from a pre-cancerous lesion. When Plaintiff first arrived at Alexander C.I. he put in a number of sick call requests and grievances to seek treatment for his swollen, painful cancerous ear. Plaintiff received surgery on May 26, 2015. Cancer had eaten most of Plaintiff's ear between February 2014 and the surgery date.

During that time all Nurse Coffey and the other medical personnel did was give Plaintiff bandages to cover the unsightly ear. Plaintiff suffered for approximately eight months at Alexander C.I. while he was under the watch of Head Nurse Coffey. "Why would it take 8 months at this facility to get approval to have the cancer removed?" (Doc. No. 110 at 4). Plaintiff is allowed to

receive monetary damages for his pain and suffering against Defendants in their individual capacities. Plaintiff "certif[ies]" that "this statement is true to the best of [his] understanding, knowledge, beliefs." (Doc. No. 110 at 5).

    **(B)**      <u>**Defendants Jackson, Oxford, and Stover**</u> (Doc. No. 111)

Plaintiff alleges that he was transferred to Brown Creek C.I. around August 15, 2013. Prior to the transfer, Plaintiff was being treated for pre-cancer on various parts of his upper body by using Flourouracil cream. After Plaintiff was transferred to Brown Creek, a pre-cancerous lesion developed on the top of Plaintiff's left ear. Plaintiff used the Flourouracil cream on the lesion. On or around February 25, 2014, the precancerous lesion ulcerated. It was very painful and sensitive to the touch. Plaintiff put in a sick call request on February 26, 2014 and did not receive any treatment for the ulcerated ear or any pain medication.

Herb Jackson was the superintendent of Brown Creek in 2013 and 2014. Plaintiff wrote numerous sick call requests while he was at Brown Creek, and grievances to try to get medical treatment for the ear. Superintendent Jackson was responsible for standard operating procedures including overseeing the medical facility at Brown Creek C.I. He is responsible for supervising the medical facility and making sure that the medical staff treat the prisoners adequately and professionally and provide treatment for serious medical needs. Defendant Jackson was deliberately indifferent when he did not order medical staff at his institution to treat Plaintiff's sensitive ulcerated ear in a timely and professional manner. Plaintiff remained at Brown Creek seven months after his ear ulcerated. Superintendent Jackson and his medical staff never did anything to treat the ear or prescribe medication for pain. Superintendent Jackson knew about Plaintiff's serious medical needs as supervisor of the medical department and from sick call requests and grievances. Superintendent Jackson's failure to provide supervision to medical staff

amounts to deliberate indifference.

Nurse Oxford was a registered nurse at Brown Creek and was in charge of providing health care for Plaintiff when he was assigned there in 2013-14. Nurse Oxford was in charge of providing and overseeing adequate treatment for Plaintiff's serious medical needs. Nurse Oxford failed/refused to give Plaintiff adequate medical care for his ulcerated, painful ear. Nor did she attempt to get any pain medication for Plaintiff. As a result of Nurse Oxford's inaction or failure to adequately treat Plaintiff, the ear ulcerated and became cancerous. Nurse Oxford's neglect and refusal of care put Plaintiff at the risk of death or for the cancer to spread to his brain and throughout his body. Nurse Oxford's deliberate indifference resulted in radiation treatment that resulted in the loss of Plaintiff's teeth, hearing, facial hair, and hair on his head, and the weakening of Plaintiff's immune system that resulted in pneumonia. The cancer spread to Plaintiff's forehead on the left side near the cancer on his ear. Plaintiff does not have enough ear left for eyeglasses to rest on; a plastic surgeon says that he needs reconstruction but that he will always have problems with the area. Supervisors' failure to review and respond to an inmate's medical complaints despite knowing that there is a breakdown of services is deliberate indifference.

Dr. Stover worked at the URB and reviewed medical requests from prison medical departments. Plaintiff's left ear had a precancerous lesion on it in 2013 and Plaintiff was being treated for it and other parts of his body with Flourouracil cream. Plaintiff used the cream as prescribed but, around February 25, 2014, the lesion ulcerated and became very painful and sensitive. Plaintiff put in a sick call request on February 26, 2014 and explained that his ear hurt and would not heal. Nurse Oxford put in a UR request on March 12, 2014 that Dr. Stover reviewed. Dr. Stover refused to approve treatment for the painful ulceration on the ear and said to keep using Efudex or Flourouracil cream. Once the ear ulcerated, Plaintiff could not use the cream to treat his

ear. Dr. Stover showed "wanton hatred and deliberate indifference" when he denied Plaintiff's URB request. (Doc. No. 111 at 8). Plaintiff wrote a grievance for Dr. Stover's refusal to approve treatment for Plaintiff's serious medical need.

Plaintiff suffered serious pain and mental anguish for approximately a year while he was assigned at Brown Creek before he was transferred to Alexander C.I. on September 11, 2014. Nothing was done to treat the cancer or prescribe any pain medication during that time. Plaintiff has stated a claim for deliberate indifference, supervisory liability, and received such grossly incompetent or inadequate care so as to shock the conscience. Plaintiff is entitled to punitive damages. Plaintiff "certify[ies]" that his statement "is true to the best of [his] understanding and knowledge." (Doc. No. 111 at 10).

**(4)**    **Evidence**[1]

    **(A)**    **Affidavit of Vicki Coffey, R.N.** (Doc. No. 103-7)

Defendant Coffey, a Registered Nurse, has been a practicing nurse for more than 40 years. She was employed at Alexander C.I. from February 2004 until April 14, 2015 and has served in the roles of nurse, lead nurse, and head nurse. Defendant Coffey followed all NCDPS policies and procedures while treating Plaintiff. Plaintiff's allegation that Defendant Coffey was deliberately indifferent by prolonging his being seen by a cancer specialist/surgeon is "wholly untrue." (Doc. No. 103-7 at 1). Defendant Coffey did not deliberately delay and/or deny Plaintiff's medical needs, nor did she ever consider taking any action with any knowledge or reason to know that it would cause Plaintiff pain.

Plaintiff was transferred in from another facility and received a screening exam upon entry. At that time, he reported a growth on his ear for which he had previously seen a dermatologist.

---

[1] This section is not exhaustive.

Defendant Coffey examined Plaintiff and was able to get an order from a nurse practitioner, supervised by Dr. Jones at Alexander C.I., to see a dermatologist and surgeon.

Defendant Coffey followed procedures and sent the order to the Medical Records Department at Alexander C.I., who sent the order request to the URB in Raleigh via the electronic computer system. The UR had 30 days by policy to review the order request and had the ability to ask for further information before deciding whether Plaintiff could see a specialty provider.

The URB approved the order for a dermatologist visit and the Medical Records Department at Alexander C.I. set the appointment.

The dermatologist requested that Plaintiff see a surgeon, and Alexander C.I.'s Medical Records Department again sent the order request to the URB for approval. The URB approved the surgeon appointment and, on the last day Defendant Coffey worked at Alexander C.I., the Medical Records Department informed Defendant Coffey, who so informed Plaintiff.

Plaintiff was always treated with dignity and respect by Defendant Coffey and any staff she observed, and she practiced within the standards of care in her treatment of Plaintiff.

Any time Defendant Coffey served Plaintiff, she examined him, scheduled necessary appointments with the providers at Alexander C.I., and met the demands in the ordinary course of business with diligence and care to ensure Plaintiff's needs were accommodated pursuant to NCDPS policies and procedures.

Defendant Coffey never prolonged or withheld care to Plaintiff, nor did she act with any animus towards him. Rather, she timely and professionally provided him with nursing care.

At all times and in all ways, Nurse Coffey practiced within the standards of care in her care and treatment of Plaintiff and treated him with dignity and respect throughout that time.

**(B)** **Affidavit of Herbert L. Jackson** (Doc. No. 106-1)

Defendant Jackson was employed by NCDPS from 1981 until 2016. He was Assistant Superintendent for Custody and Operations at Brown Creek C.I. from 1996 to 2005, and Correctional Administrator at Brown Creek C.I. from 2005 to 2016. As Correctional Administrator at Brown Creek C.I., Defendant Jackson is responsible for overseeing all staff and inmates under his supervisory chain of command to ensure compliance with NCDPS policies and procedures. His duties included review of any grievances submitted by an inmate at Brown Creek C.I. prior to the Supervising Manager signing the Step 2 Response to the grievance.

During all times relevant to this case, correctional staff like Defendant Jackson would not be responsible for personally providing clinical health care to inmates at Brown Creek C.I. including medications and medical treatment. Defendant Jackson has no formal medical training and he is not licensed to prescribe medications. Defendant Jackson is not a health care provider and was not, at any relevant time, responsible for personally providing clinical or medical care to inmates at Brown Creek C.I. Defendant Jackson is not responsible for the clinical supervision of any clinical or medical care providers at the facility. As Correctional Administrator at all relevant times, his responsibilities included administrative, but not clinical, supervision of health-related operations at the facility. Any medical treatments or medications can only be performed or prescribed by licensed medical staff.

NCDPS policy and procedures provide that clinical matters involving medical care judgments are the sole province of licensed clinical and mental health care providers, not the Correctional Administrator. Pursuant to NCDPS policy and procedures, all inmates can access routine health care through the sick call process and all inmates have the ability to declare a medical emergency. Correctional staff such as Defendant Jackson would not have any training on the appropriate medical treatments for inmates, nor would he have the ability to control or alter a

plan of care concerning an inmate's medical care. Correctional staff such as Defendant Jackson are only allowed limited information regarding an inmate's health records pursuant to HIPPA.

In addition to the sick call appointment request process, Plaintiff also had access to the grievance process through which he could complain about his medical or mental health treatment. Any of Plaintiff's complaints would be investigated through the grievance process. Plaintiff did file a grievance on June 28, 2014, in which he alleged that the medical department at Brown Creek C.I. was deliberately indifferent to his serious medical needs. The grievance was investigated and it was determined that Plaintiff was seen by the medical department for his ear on March 4, 2014, and was referred to be seen by Dr. Hassan. Dr. Hassan requested a dermatology consult on March 12, 2014, and a UR request was submitted by Nurse Oxford. On May 19, 2014, photographs were sent at Dr. Stover's request. Dr. Stover denied the URB request for a dermatology consult. The Step One grievance response noted that Plaintiff had been prescribed Efudex and that Plaintiff had not resubmitted a sick call appointment request indicating that he was having continuing problems or pain. At Step Two, the Step One response was confirmed. The Step Two investigation noted that Plaintiff was examined and was given appropriate medication, and that his URB request was timely processed. At Step Three, the Step One and Two responses were confirmed.

As Correctional Administrator, Defendant Jackson was not personally involved in the decision-making process or otherwise involved in the URB. Defendant Jackson is unaware of any medical staff intentionally preventing Plaintiff from receiving medical treatment or being deliberately indifferent to his serious medical needs. He is also unaware of any healthcare provider who intentionally delayed providing medical treatment to Plaintiff.

    **(C)**    **Affidavit of Maria Oxford, R.N.** (Doc. No. 106-5)

Defendant Oxford was employed with NCDPS as a Registered Nurse at Lanesboro C.I.

from April 2013 through March 2015 and resigned effective March 9, 2015. From September 2013 through April 2014, she worked as a Registered Nurse at Brown Creek C.I. As a Registered Nurse, Defendant Oxford is responsible as the primary care provider of the inmates who have various acute and chronic diseases to ensure compliance with NCDPS policies and procedures.

NCDPS policy and procedures provide that clinical matters involving medical care judgments are the sole province of licensed clinical and mental healthcare providers such as Defendant Oxford. The Facility Head is responsible for providing an environment that ensures the appropriate delivery of medical and mental health services. The Facility Head designates in writing a specific individual with the responsibility for overseeing/managing the provision of health services to their facility. The Facility Head or designee is responsible for making sure that procedures, such as sick call appointment requests, exist whereby the inmate population has access to healthcare.

Pursuant to NCDPS policy and procedures, all inmates can access routine healthcare through the sick call process and can declare a medical emergency. Plaintiff also had access to the grievance process through which he could complain about his medical or mental health treatment. Any of Plaintiff's complaints would be investigated through the grievance process.

Based on Defendant Oxford's review of the medical records, Plaintiff was assessed on February 22, 2013 at Pamlico C.I. with multiple areas of extensive sun damage with resultant actinic keratosis, seborrheic keratosis and an area on his right hand that was suspicious for basal cell carcinoma. There was no specific mention or complaints about Plaintiff's left earlobe. The medical provider's plan at that point was to refer Plaintiff to dermatology for further assessment.

Plaintiff underwent a "telemedicine consultation" with Dr. Sarah Chisolm on April 17, 2013. Plaintiff was evaluated for skin/sun damage. Dr. Chisolm assessed Plaintiff with actinic

keratosis on his right hand and seborrheic keratosis on his right chest which was benign or non-cancerous. Dr. Chisolm did not note any skin abnormalities involving Plaintiff's left earlobe and Plaintiff did not voice any subjective complaints regarding his left earlobe.

On February 2, 2014 Plaintiff filled out a Sick Call Appointment Request to be seen by the medical department at Brown C.I. for a painful place on his ear that would not heal. On February 4, 2014, Plaintiff advised the medical department that his issues had been addressed in a previous sick call and did not request any further treatment at that time.

On February 26, 2014 Plaintiff complained in a Sick Call Appointment Request that he needed a dermatologist to cut a skin cancer off his left ear that was painful and would not heal. The request was triaged by a nurse within 24 hours pursuant to NCDPS policy and procedures and Plaintiff was scheduled to be seen by a nurse in Sick Call. Defendant Oxford had no involvement in the triage process or scheduling process for Plaintiff to be seen in sick call. Plaintiff's appointment was scheduled for March 4, 2014, six days after Plaintiff filled out the request, which is reasonable and timely pursuant to NCDPS policy and procedures. Defendant Oxford saw Plaintiff on March 4, 2014. She noted that Plaintiff complained that his left earlobe at the top hurts when he lies on it and he is using Efudex/Fluorouracil to treat it but that it does not seem to be healing. Defendant Oxford noted the following during the physical assessment of the earlobe: "[Left] ear tip [slightly] swollen [with] dry skin [and] noted pinpoint sized black dot on ear in swollen area. Pain when laying down is 5/10 pain scale, otherwise doesn't bother him. [History] basal cell [cancer]. [Dermatology] noted for them to reassess [changes]." (Doc. No. 106-5 at 5). Based on the physical assessment and Plaintiff's family history, on March 4, 2014, Defendant Oxford referred Plaintiff to be seen by Dr. Hassan.

On March 12, 2014, Plaintiff was seen by Dr. Hassan, who requested a dermatology consult

to evaluate Plaintiff's left earlobe. In order to schedule the dermatology consult pursuant to Dr. Hassan's orders, Defendant Oxford submitted a request to the URB that same day.

From September 2013 through April 2014, Defendant Oxford worked as a Registered Nurse at Brown Creek C.I. To the best of her knowledge, after April 2014, she was no longer involved with Plaintiff's medical care or treatment. Based on her review of the records, Plaintiff continued to submit Sick Call Appointment Requests regarding his left ear after he was transferred out of Brown Creek C.I., all of which were timely, reasonably, and appropriately addressed. Defendant Oxford had no further involvement with Plaintiff's treatment after he was transferred from Brown Creek C.I.

On July 3, 2014, Plaintiff filled out a Sick Call Appointment Request stating "I have cancer on my left ear." (Doc. No. 106-5 at 6). His request was triaged the same day and he was seen in the medical department at Brown Creek C.I. on July 9, 2014. In assessing Plaintiff, the nurse noted a "[s]mall red dot on the top of left ear. Inmate has been seen by MD for this before – UR request for dermatology was denied… Inmate to be seen by MD for evaluation." (Doc. No. 106-5 at 6).

On September 11, 2014, Plaintiff filled out a Sick Call Appointment Request stating "I have a cancerous ear, and it is very painful. I need the place cut off." (Doc. No. 106-5 at 6). The request was triaged the next day and Plaintiff was seen by the medical department at Alexander C.I. on September 20, 2014. The nurse noted an "[a]rea to top of left ear appears red, no [signs/symptoms of] infection, states it is tender to touch and he is unable to sleep on that side [due to] pain. No drainage. There is a small area that may be where there was some skin removed." (Doc. No. 106-5 at 7). Plaintiff was instructed to return to medical "prn" or on as as-needed basis. (Doc. No. 106-5 at 7).

On October 2, 2014, Plaintiff was seen by the medical provider regarding his ear and was

diagnosed with an earlobe infection. Plaintiff was prescribed an antibiotic to treat the infection.

On October 13, 2014, Plaintiff filled out a Sick Call Appointment Request stating "I saw the doctor app. a week ago about an infection of my ear" and that he had run out of antibiotic without any improvement of the symptoms. (Doc. No. 106-5 at 7). Plaintiff's request was triaged the next day and it was noted that this is a duplicate request.

On October 19, 2014, Plaintiff filled out a Sick Call Appointment Request stating "[m]y ear that the doctor treated me for app. a week has gotten worse. It is swollen and is draining fluid." (Doc. No. 106-5 at 7). Plaintiff's request was triaged the same day and Plaintiff was assessed by a nurse at Alexander C.I. on October 21, 2014. Plaintiff told the nurse that "[i]t seemed like it was going to heal but then it didn't. I think if I'd had some Neosporin and more antibiotics it would have." (Doc. No. 106-5 at 8). The nurse noted that the ear appeared red and was tender to the touch, and no drainage was noted. Plaintiff was placed on the list to see the medical provider for possible further antibiotic treatments.

On October 23, 2014, Plaintiff was seen by the medical provider who assessed the ear as red and swollen with no drainage. Plaintiff completed his antibiotic treatment as previously ordered on October 2, 2014, and the medical provider prescribed 10 days on a different antibiotic to treat the infection. The provider also ordered an antibiotic cream for 10 days. Plaintiff was scheduled to follow up in two weeks for further evaluation.

On November 13, 2014, Plaintiff was seen by the medical provider as a follow up. The provider noted swelling and drainage and diagnosed a persistent earlobe infection and ordered cultures. The provider also prescribed another antibiotic for 14 days to treat the infection.

On November 30, 2014, Plaintiff filled out a Sick Call Appointment Request stating the ear was "still swollen and draining" and sore. (Doc. No. 106-5 at 9). On December 2, 2014, the

nurse at Alexander C.I. noted that Plaintiff was already scheduled to see the medical provider the following day.

On December 2, 2014, a URB request was submitted for a dermatology consult for Plaintiff's ear. On December 3, 2014, Plaintiff was seen by the medical provider who noted the ear was "essentially unchanged" and he was referred to dermatology for a consult. (Doc. No. 106-5 at 9).

On December 18, 2014, a biopsy was obtained of the ear. On January 3, 2015, the medical provider noted a URB request for dermatology based on the biopsy testing positive for squamous cell carcinoma.

On February 27, 2015, Plaintiff was called to medical at Alexander C.I. to check his ear but Plaintiff became loud and argumentative and medical was unable to assess his ear.

On March 6, 2015, Plaintiff filled out a Sick Call Appointment Request stating "I have cancer of my ear and it has eaten half of my ear off." (Doc. No. 106-5 at 9). Plaintiff requested a refill of his pain medications. On March 21, 2015, the nurse at Alexander C.I. noted that she had addressed Plaintiff's request with the medical provider.

On April 2, 2015, Plaintiff filled out a Sick Call Appointment Request stating "I have cancer of my ear and it has eaten half of my ear off." (Doc. No. 106-5 at 10). Plaintiff's request was triaged the next day and, that same day, the nurse noted that Plaintiff had seen the medical provider on March 24, 2015 and that "scans pending." (Doc. No. 106-5 at 10).

On April 22, 2015, Plaintiff was assessed by the medical provider following surgical removal of a portion of his left ear on April 20, 2015 due to cancer. Plaintiff self-reported that he was pain-free. He was assessed by the medical provider as being in no distress.

On April 23, 2015, Plaintiff filled out a Sick Call Appointment Request stating that his ear

17

was healing nicely and asked that physical restrictions be removed by the medical department so that he could exercise. His request was triaged on April 26, 2015 and, on April 28, 2015, the nurse at Alexander C.I. noted that his physical restrictions had expired in March.

As a Registered Nurse at Brown Creek C.I., Defendant Oxford was not personally involved in the decision-making process or otherwise involved with the URB. Defendant Oxford is unaware of any medical staff intentionally preventing Plaintiff from receiving his medical treatment or being deliberately indifferent to a serious medical need. She is also unaware of any healthcare provider intentionally delaying medical treatment to Plaintiff.

**(D)**     **Affidavit of Phillip Stover, M.D.** (Doc. No. 106-30)

Defendant Stover was employed from February 1992 through 2014 with NCDPS as a Medical Consultant. He retired effective December 31, 2014. As Medical Consultant, his responsibility as a utilization review physician included the review and assessment of medical request to the URB. All non-emergent off-site medical appointments, treatments, specialty referrals, or consultations require prior approval from the URB.

Nurse Oxford submitted a URB request on March 12, 2014. In response to Nurse Oxford's URB request, and as part of his duties as a Medical Consultant and utilization review physician for NCDPS, Dr. Stover requested that photographs be taken of Plaintiff's left earlobe. The photographs were posted for viewing on May 19, 2014. "Based upon [his] medical background, training, education, experience, and the information provided … in the URB request, including the photographs of Plaintiff's left ear lobe, [Dr. Stover] denied the request for a dermatology consultation. (Doc. No. 106-30 at 5). Dr. Stover assessed Plaintiff's earlobe as showing some "mild actinic keratosis" and suggested treatment with Efudex, which is a topical cream which blocks the growth of abnormal cells that cause precancerous and cancerous skin growths. (Doc. No. 106-30

at 5). Plaintiff had previously been diagnosed with actinic keratosis on his right hand and chest and had previously been treated with Efudex cream.

Dr. Stover is not aware of any other interactions involving Plaintiff's care and treatment of his left earlobe. Dr. Stover never clinically treated Plaintiff at any NCDPS facility including Brown Creek C.I., and Dr. Stover was never deliberately indifferent to Plaintiff's serious medical needs, including the care and treatment of his left earlobe.

As a Medical Consultant and utilization review physician at NCDPS, Dr. Stover is unaware of any medical staff intentionally preventing Plaintiff from receiving his medical treatment or being deliberately indifferent to his serious medical needs. Dr. Stover is also unaware of any healthcare provider who intentionally delayed providing medical treatment to Plaintiff.

    **(E)**    <u>**Time Line**</u>

| | |
|---|---|
| 2/22/13 | <u>Provider Progress Notes</u>: annual reevaluation; "multiple areas of extensive sun damage to skin resultant actinic keratosis, seborrheic keratosis, area r hand … suspicious for basal cell ca.;" "refer to dermatology" (Doc. No. 106-8 at 1-2). |
| 3/14/13 | <u>Chronological Record of Health Care</u>: antibiotic ointment and bandages given (Doc. No. 106-10) |
| 4/17/13 | <u>Telemedicine Consultation</u> by Dr. Sarah Chisolm; Chief Complaint "sun damage on skin and face;" actinic keratosis, seborrheic keratosis (Doc. No. 106-9) |
| 8/15/13 | <u>Transfer</u> to Brown Creek C.I. (Doc. No. 111 at 1) |
| 2/2/14 | <u>Sick Call Appointment Request</u>: history of skin cancer, has a place on his left ear that will not heal and is painful, requests dermatology consult (Doc. No. 106-11) |
| 2/4/14 | <u>Sick Call Appointment</u>: Pt states issues were addressed in previous sick call (Doc. No. 106-11) |
| 2/26/14 | <u>Sick Call Appointment Request</u>: needs to see a dermatologist about skin cancer on the left ear (Doc. No. 106-4 at 3) |
| 3/4/14 | <u>Sick Call Appointment</u>: "L ear @ top hurts when lie on it – using flouracil – not seem to be healing" "L ear tip s/ swollen a dry skin & noted pinpoint sized black |

dot on ear in swollen area … Hx basal cell ca. Derm noted for them to reassess;" "refer to derm for black spot L ear? See Telemed Note" (Doc. No. 106-12)

3/12/14    URB Request by Oxford: requesting dermatology consult (Doc. No. 106-4 at 6)

5/19/14    URB Comments by Dr. Stover: denied "Pictures do not support the need for this. He may have some mild actinic keratosis which I suggest if you're concerned that you treat with Efudex." (Doc. No. 106-4 at 6)

5/28/14    Administrative Remedy Procedure (Brown Creek C.I.): medical is refusing treatment for cancerous left ear (Doc. No. 106-4 at 2)

7/3/14     Sick Call Appointment Request: "I have cancer on my left ear" (Doc. No. 106-15)

7/9/14     Sick Call Appointment: "Inmate reports ear pain on L ear. Small red dot on top of L ear. Inmate has been seen by MD for this before – UR request for dermatology was denied" (Doc. No. 106-15)

7/10/14    Step One Response: Plaintiff was seen by nurse on 3/4/14 and by Dr. Hassan on 3/12/14. Dr. Hassan requested a dermatology consult which was denied 5/21/14. Plaintiff has a current Rx for Efudex and he has not resubmitted a Sick Call Request indicating he is having continued problems or pain. (Doc. No. 106-4 at 4)

7/25/14    Step Two Response: Plaintiff is receiving accessible and appropriate healthcare consistent with applicable community standards. (Doc. No. 106-4 at 4)

9/11/14    Transfer to Alexander C.I. (Doc. No. 111 at 10)

           Sick Call Appointment Request: "I have a cancerous ear, and it is very painful. I need the place cut off." (Doc. No. 106-16)

9/12/14    Step Three Response: grievance is considered resolved (Doc. No. 106-4 at 1)

9/20/14    Sick Call Appointment: "Has Hx of basal cell carcinoma, states he has had 'many areas removed.' Area to top of L ear appears red, no s/s infection, states it is tender to touch & he is unable to sleep on that side dt pain. No drainage. There is a small area that may be where there was some skin removed…. Will refer to provider for … skin issue on L ear…." (Doc. No. 106-17)

10/2/14    Provider Progress Notes: "sore L earlobe almost one year;" "L auricle swollen, red;" "L earlobe infection … Keflex" (Doc. No. 106-17)

10/4/14    Provider Orders: Keflex 500 mg 10 days (Doc. No. 106-20)

10/13/14   Sick Call Appointment Request: was given antibiotic for his left ear a week ago

and has used all the medication and the infection is still there, needs to try another treatment (Doc. No. 106-18)

10/17/14     Sick Call Appointment Request: follow up; the ear has gotten worse; swollen and draining (Doc. No. 106-19)

10/19/14     Sick Call Appointment: "My ear is still draining. It hurts to touch it and I can't sleep on that side. It seemed like it was going to heal but then it didn't. I think if I'd had some Neosporin and more antibiotics, it would have;" "L ear appears red … area of swelling at the top. Tender to touch. No drainage noted at this time;" "will place on provider list to eval for repeat Keflex/ antibiotic" (Doc. No. 106-19)

10/21/14     Sick Call Appointment: Duplicate request (Doc. No. 106-18)

10/23/14     Provider Orders: Augmentin 500 mg/10 days; follow up in 2 weeks (Doc. No. 106-20)

10/26/14     Provider Orders: clarification of Augmentin order (Doc. No. 106-21)

11/13/14     Provider Progress Notes: checkup for ear infection, culture taken; upper lobe swollen (Doc. No. 106-17)

             Provider Orders: Doxycycline 100 mg/14 days (Doc. No. 106-21)

11/30/14     Sick Call Appointment Request: left ear is swollen and draining, "I think I need to go to see a dermatologist or some specialist" (Doc. No. 106-22)

12/2/14      Sick Call Appointment: Patient is on doctor's list for 12/3 (Doc. No. 106-22)

             Provider Orders: "UR for Dermatologist consult (done)" (Doc. No. 106-23)

12/3/14      Provider Progress Notes: "culture back - no [illegible] growth; not currently on antibiotics" (Doc. No. 106-24)

2/18/14      Provider Progress Notes: biopsy done, specimen sent to lab (Doc. No. 106-24)

             Provider Orders: tissue sent to lab for ID, L earlobe (Doc. No. 106-23)

1/3/15       Consultation/Referral Form: "Urgent" referral to ENT; "Positive for squamous cell carcinoma." (Doc. No. 103-1).

             Provider Orders: "UR for Dermatology consult" (Doc. No. 106-23)

1/17/15      Provider Progress Notes: Pt updated on biopsy diagnosis; awaiting dermatologist appointment (Doc. No. 106-24)

| | |
|---|---|
| 1/22/15 | <u>Chronological Record of Health Care</u>: "According to Ms. Coffey RN, the ear lesion was approximately 2-3 cm prior to biopsy performed on 12/18/14" (Doc. No. 106-25) |
| 2/27/15 | <u>Consultation/Referral Form</u>: "Urgent" referral to UNC clinic; "Local ENT requests eval. for excision of ear…." (Doc. No. 103-2) |
| | <u>Provider Orders</u>: "UR for UNC ENT Clinic @ CP for possible excision of left ear and possible lymph nodes" (Doc. No. 106-23) |
| | <u>Chronological Record of Health Care</u>: "Patient called to medical to check his ear. Became loud and argumentative. Unable to assess." (Doc. No. 106-24) |
| 3/4/15 | <u>Provider Progress Notes</u>: Pt recently saw ENT for his left ear; surgical appointment is pending (Doc. No. 106-24) |
| 3/6/15 | <u>Sick Call Appointment Request</u>: "I have cancer of my ear and it has eaten half my ear off, I am in severe pain" (Doc. No. 106-26) |
| 3/20/15 | <u>Progress Notes</u>: by Dr. Patel; Otolaryngology-Head and Neck Surgery Consult Note (Doc. No. 103-3) |
| 3/21/15 | <u>Sick Call Appointment</u>: addressed with provider (Doc. No. 106-26) |
| 3/23/15 | <u>Consultation/Referral Form</u>: "Urgent" referral to UNC ENT Dr. Patel; "UR for surgery…." (Doc. No. 103-4) |
| 4/2/15 | <u>Sick Call Appointment Request</u>: "My ear is painful and swollen all over, the cancer has spread over my whole ear and has eaten all my ear up. This is an urgent situation. This ear needs to be taken off immediately to keep the cancer from spreading to my brain and other body parts." (Doc. No. 106-27) |
| 4/3/15 | <u>Sick Call Appointment</u>: saw provider for problem on 3/24, scans pending (Doc. No. 106-27) |
| 4/20/15 | <u>Follow Up Instructions and Outpatient Referrals</u> (Doc. No. 103-5) |
| 4/22/15 | <u>Provider Progress Notes</u>: Pt seen s/p surgery L ear; he feels pain free (Doc. No. 106-28) |
| 4/25/15 | <u>Sick Call Appointment Request</u>: ear appears to be healing nicely from surgery, wants medical restrictions lifted (Doc. No. 106-29) |
| 4/26/15 | <u>Sick Call Appointment</u>: all restrictions expired 3/2015 (Doc. No. 106-29) |

| | |
|---|---|
| 5/6/15 | <u>Consultation/Referral Form</u>: UNC Medical Radiology; requesting approval for medical radiology for consideration of postoperative chemo or radiation (Doc. No. 103-6) |
| 5/25/15 | <u>Chronological Record of Health Care</u>: chart sealed for trip to UNC oncology (Doc. No. 106-25) |
| 5/26/15 | <u>Chronological Record of Health Care</u>: "returned from appointment, states he is going to need more radiation (Doc. No. 106-25) |

## II.     LEGAL STANDARDS

**(1)     <u>Summary Judgment</u>**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fec. R. Civ. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A fact is material only if it might affect the outcome of the suit under governing law.  <u>Id.</u>

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party.  The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." <u>Id.</u> at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment.  <u>Id.</u> at 324.  The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party."

Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

As a general rule, when one party files a motion for summary judgment, the non-movant cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like, respond to the motion. Celotex, 477 U.S. at 324; Kipps v. Ewell, 538 F.2d 564, 566 (4th Cir. 1976); Fed. R. Civ. P. 56(e). However, a verified complaint, like the Amended Complaint that Plaintiff filed, is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991); Davis v. Zahradnick, 600 F.2d 458, 459–60 (4th Cir. 1979) (holding that the factual allegations contained in a verified complaint establish a prima facie case under 42 U.S.C. § 1983, so as to preclude summary judgment).

Plaintiff was informed in a detailed Order about the applicable legal standards, his obligation to respond to Defendants' Motions for Summary Judgment, and his burden to support his assertions with admissible evidence or statements "under penalty of perjury." See (Doc. No. 107 at 3). Neither Plaintiff's Amended Complaint nor his summary judgment Responses is verified. Orsi v. Kirkwood, 999 F.2d 86, 92 (4th Cir. 1993) ("It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment."). Therefore, the Court construes Plaintiff's Amended Complaint and Responses as "mere pleading

allegations." <u>Walker v. Tyler County Com'n</u>, 11 Fed. Appx. 270 (4th Cir. 2001); Fed. R. Civ. P. 56(c), (e).

**(2)**     <u>**Deliberate Indifference**</u>

"[T]he Eighth Amendment's prohibition against 'cruel and unusual punishments' [extends] to the treatment of prisoners by prison officials" and "forbids the unnecessary and wanton infliction of pain," <u>Hill v. Crum</u>, 727 F.3d 312, 317 (4th Cir. 2013) (internal quotations omitted). It appears that Plaintiff was an arrestee or pre-trial detainee at the relevant times, so his deliberate indifference claim is properly brought under the Fourteenth Amendment rather than the Eighth Amendment, but the analysis is the same under both.[2] <u>See</u> <u>City of Revere v. Mass. Gen. Hosp.</u>, 463 U.S. 239 (1983); <u>see</u> <u>also</u> <u>Martin v. Gentile</u>, 849 F.2d 863 (4th Cir. 1988) (applying the Fourteenth Amendment to an arrestee's deliberate indifference claim); <u>but</u> <u>see</u> <u>Kingsley v. Hendrickson</u>, 135 S. Ct. 2466, 2473, 2475 (2015) (holding that the test for excessive force claims brought by pretrial detainees under the Fourteenth Amendment differs from the test for excessive force claims brought by convicted prisoners under the Eighth Amendment); <u>see</u> <u>Lanier v. Henderson Cnty. Det. Ctr.</u>, 2016 WL 7007537 at *2, n. 3 (W.D.N.C. Nov. 29, 2016) (noting that the Supreme Court in <u>Kingsley</u> did not explicitly extend the objective reasonableness standard outside the excessive force context); <u>see</u>, <u>e.g.</u>, <u>Duff v. Potter</u>, 665 Fed. Appx. 242, 244-45 (4th Cir. 2016) (applying the <u>Kingsley</u> standard to a detainee's excessive force claim but not his medical need claim).

"Prisoners alleging that they have been subjected to unconstitutional conditions of confinement must satisfy the Supreme Court's two-pronged test set forth in <u>Farmer v. Brennan,</u>

---

[2] In the Amended Complaint, Plaintiff refers to himself as a convicted and sentenced state prisoner. (Doc. No. 11 at 4). That may be the case at the time he filed the Amended Complaint, however, it appears that he was an arrestee and pretrial detainee at the time the incidents in question occurred.

[511 U.S. 825, 832 (1994)]." <u>Scinto v. Stansberry</u>, 841 F.3d 219, 225 (4ᵗʰ Cir. 2016). The plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry. <u>See</u> <u>Iko v. Shreve</u>, 535 F.3d 225, 241 (4ᵗʰ Cir. 2008). In order to be sufficiently serious, the deprivation must pose "a serious or significant physical or emotional injury resulting from the challenged conditions," or "a substantial risk of such serious harm resulting from ... exposure to the challenged conditions." <u>De'Lonta v. Angelone</u>, 330 F.3d 630, 634 (4ᵗʰ Cir. 2003) (internal quotation marks and citation omitted). To constitute deliberate indifferent to a serious medical need, "the treatment [a prisoner receives] must be so grossly incompetent, inadequate, or excessive to shock the conscience or to be intolerable to fundamental fairness." <u>Miltier v. Beorn</u>, 896 F.2d 848, 851 (4ᵗʰ Cir. 1990), *overruled on other grounds by* <u>Farmer</u>, 511 U.S. at 825. Where a deliberate indifference claim is predicated on a delay in medical care, there is no Eighth Amendment violation unless "the delay results in some substantial harm to the patient" such as "marked" exacerbation in his medical condition or "frequent complaints of severe pain." <u>Formica v. Aylor</u>, 739 Fed. Appx. 745, 755 (4ᵗʰ Cir. 2018) (noting that Fourth Circuit unpublished opinions are not binding precedent but noting that the substantial harm standard is consistent with at least four other courts of appeals) (quoting <u>Webb v. Hamidullah</u>, 281 Fed. Appx. 159, 166-67) (4ᵗʰ Cir. 2008), citing <u>Sharpe v. S.C. Dep't of Corr.</u>, 621 Fed. Appx. 732, 734 (4ᵗʰ Cir. 2015)).

Mere negligence or malpractice does not violate the Eighth Amendment. <u>Miltier</u>, 896 F.2d at 852. Further, "mere '[d]isagreements between an inmate and a physician over the inmate's proper medical care' are not actionable absent exceptional circumstances." <u>Scinto</u>, 841 F.3d at 225 (quoting <u>Wright v. Collins</u>, 766 F.2d 841, 840 (4ᵗʰ Cir. 1985)).

**(3)**     <u>**Sovereign Immunity**</u>

The Eleventh Amendment bars suits directly against a state or its agencies, unless the state has waived its immunity or Congress has exercised its power under § 5 of the Fourteenth Amendment to override that immunity. <u>Will v. Michigan Dep't of State Police</u>, 491 U.S. 58, 66 (1989). Congress has not imposed § 1983 liability upon states, and the state of North Carolina has done nothing to waive its immunity. <u>Bright v. McClure</u>, 865 F.2d 623, 626 (4th Cir. 1989) (citing <u>McConnell v. Adams</u>, 829 F.2d 1319, 1328 (4th Cir. 1987)).

"[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity." <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985). Therefore, a lawsuit against an officer in his official capacity is, in substance, a claim against the governmental entity and should be subject to the same analysis. <u>See</u> <u>Almone v. City of Long Beach</u>, 478 F.3d 100, 106 (2d Cir. 2007); <u>see</u> <u>Hutto v. S.C. Retirement Sys.</u>, 773 F.3d 536, 549 (4th Cir. 2014) (State officials sued in their official capacities for retrospective money damages have the same sovereign immunity accorded to the State).

**(4)** <u>**Qualified Immunity**</u>

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009). The existence of qualified immunity "generally turns on the 'objective reasonableness' of the actions" without regard to the knowledge or subjective intent of the particular official. <u>Am. Civil Libs. Union of Md., Inc. v. Wicomico County, Md.</u>, 999 F.2d

780, 784 (4th Cir. 1993) (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 639, 641 (1987)) (internal citations omitted).

In <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims by determining whether: (1) the facts that a plaintiff has alleged or shown make out a violation of a constitutional right; and (2) the right at issue was "clearly established" at the time of defendant's alleged misconduct. While the sequence of the steps set forth in <u>Saucier</u> is "often appropriate," it is not mandatory. <u>Pearson</u>, 555 U.S. at 236. Judges are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. <u>Id.</u>

To overcome the qualified immunity defense at the summary judgment stage, the plaintiff must have shown facts that make out a violation of a constitutional right, and the right at issue must have been "clearly established" at the time of the defendant's alleged misconduct. <u>Thompson v. Commonweath of Va.</u>, 878 F.3d 89, 97 (4th Cir. 2017) (citing <u>Pearson</u>, 555 U.S. at 232). The analysis takes place against the backdrop of two dueling interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson</u>, 555 U.S. at 231.

To find a right is clearly established does not mean that "the exact conduct at issue [must] have been held unlawful for the law governing an officer's actions to be clearly established." <u>Amaechi v. West</u>, 237 F.3d 356, 362 (4th Cir. 2001). Rather, the court's analysis must take into consideration "not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." <u>Id.</u> at 362-63

(internal quotation omitted). The right at issue is "clearly established" for qualified immunity purposes if:

> [t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.

Anderson, 483 U.S. at 640 (citation omitted).

To determine if the right in question was clearly established, the court first looks to cases from the Supreme Court, the Fourth Circuit, or the highest court of the state in which the action arose. Owens ex rel. Owens v. Lott, 372 F.3d 267, 279 (4th Cir. 2004). In the absence of "directly on-point binding authority," courts may also consider whether "the right was clearly established based on general constitutional principles or a consensus of persuasive authority." Booker v. South Carolina Dep't of Corr., 855 F.3d 533, 543 (4th Cir. 2017); Owens, 372 F.3d at 279 ("the absence of controlling authority holding identical conduct unlawful does not guarantee qualified immunity."). Ordinarily, the unlawfulness of government conduct must be apparent in light of pre-existing law. White v. Pauly, 137 S.Ct. 548, 442 (2017). However, a "general constitutional rule … may apply with obvious clarity ... even though the very action in question has not previously been held unlawful. Hope v. Pelzer, 536 U.S. 730, 741 (2002) (citing United States v. Lanier, 520 U.S. 259, 271 (1997)). Therefore, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Id. at 741.

## III.  DISCUSSION

### (1)  Deliberate Indifference

### (A)  Defendant Coffey

Plaintiff alleges in his unverified Amended Complaint that he was assigned to Alexander

C.I. around September 2014, and his ear was treated with antibiotics, which did nothing to ease the pain or heal the ear lesion. He alleges that Head Nurse Coffey delayed sending him to a cancer specialist for several months which allowed the cancer to spread and endanger his life, and most of the ear was surgically removed after waiting a year for treatment. He claims that the delay necessitated radiation therapy which caused loss of facial and head hair, teeth, and hearing.

Defendant Coffey does not dispute that Plaintiff suffers from basal cell cancer on his ear and suffered from a serious medical need. However, Defendant Coffey states in her affidavit that she followed all NCDPS policies and procedures while treating Plaintiff and denying that she was deliberately indifferent. Defendant Coffey did not deliberately delay and/or deny Plaintiff's medical needs, nor did she ever consider taking any action with any knowledge or reason to know that it would cause Plaintiff pain. She states that, upon Plaintiff's transfer to Alexander C.I., he reported a growth on his ear for which he had previously seen a dermatologist. Defendant Coffey examined Plaintiff and was able to get an order from a nurse practitioner, supervised by Dr. Jones at Alexander C.I., to see a dermatologist and surgeon.

The records submitted by Defendants reveal that Plaintiff was transferred to Alexander C.I. on September 11, 2014. In a sick call request dated that same day, Plaintiff states that he has a "cancerous ear" that is very painful and needs surgery. (Doc. No. 106-16). Plaintiff saw a provider on September 20. The sick call appointments note that Plaintiff has a history of basal cell carcinoma, there is no sign of infection, and Plaintiff will be referred to a provider. (Doc. No. 106-16). The notes from his October 2, 2014 appointment find redness and swelling and prescribe antibiotics for an infection. (Doc. No. 106-17). He submitted sick call requests on October 13, and 17, 2014 noting that the ear has gotten worse and is draining and painful. (Doc. Nos. 106-18, 106-19). On October 19, 2014 Plaintiff saw a provider and stated that he feels like it would have healed

if he had more antibiotics, and more antibiotics were prescribed. (Doc. No. 106-19). During a follow up appointment on November 13, 2014 a culture was taken. (Doc. No. 106-17). On November 30, 2014 Plaintiff reported swelling and draining and asked to see a specialist. (Doc. No. 106-17). A UR request was submitted on December 2 and the culture came back negative on December 3, 2014. (Doc. Nos. 106-22, 106-24). A biopsy was done on February 18, 2014, and an Urgent UR request was done on January 3, 2015 when the biopsy returned positive for squamous cell carcinoma. (Doc. Nos. 106-24, 103-1, 106-23). Plaintiff was informed of the results on January 17 and an "urgent" UR request was submitted on February 27, 2015. (Doc. Nos. 106-24, 106-23). Plaintiff saw an ENT around March 4, 2014 and he received a consultation with a neck surgeon on March 20, 2015. (Doc. Nos. 106-24, 103-3). An "urgent" UR request for surgery was submitted on March 23, 2015. (Doc. No. 103-4). Plaintiff received surgery in late April 2015. (Doc. Nos. 103-5, 106-28).

Defendant Coffey has demonstrated that Plaintiff was provided with care based on his history and complaints, that he was provided treatment and follow-ups, he was first treated with antibiotics and then received a biopsy when a culture came back negative, then urgent UR requests were submitted when cancer was discovered. Plaintiff has failed to rebut Defendant Coffey's assertions that she never knowingly withheld or denied him needed care.

Plaintiff has failed to show that a genuine dispute of material fact remains for trial. He fails to demonstrate that Defendant Coffey knew that Plaintiff was receiving inadequate care and exposed him to a risk of harm of which she was aware. See generally Farmer, 511 U.S. at at 837 (a person is only deliberately indifferent when he disregards a risk of harm of which he is aware); Rich v. Bruce, 129 F.3d 336, 338 (4th Cir. 1997) (prison official was not deliberately indifferent even though he had actual knowledge of facts from which a reasonable person might have drawn

an inference that defendant's actions exposed plaintiff to a substantial risk of serious harm because he did not actually draw the inference). At most, he has shown that his providers misdiagnosed his cancer as an infection and spent several months pursuing inappropriate treatment. However, mere negligence or malpractice does not violate the Eighth Amendment. See Miltier, 896 F.2d at 85; Scinto, 841 F.3d at 225 ("mere '[d]isagreements between an inmate and a physician over the inmate's proper medical care' are not actionable absent exceptional circumstances.") (quotations omitted). Therefore Defendant Coffey's Motion for Summary Judgment will be granted.

**(B)**     **Defendant Oxford**

Plaintiff alleges in his unverified Amended Complaint that Nurse Oxford refused to make arrangements for proper treatment for Plaintiff in 2013 and 2014. (Doc. No. 24 at 5).

The record reveals that Plaintiff was transferred to Brown Creek C.I. on August 15, 2013. (Doc. No. 111 at 1). Plaintiff submitted a sick call request on February 2, 2014 that notes a history of skin cancer and requests a dermatology consultation for a place on his left ear that is painful and will not heal. (Doc. No. 106-11). However, at his appointment on February 4, 2014, Plaintiff stated that his issues were addressed a previous sick call. (Doc. No. 106-11). He submitted another sick call request on February 26, 2014 again asking to see a dermatologist. (Doc. No. 106-4 at 3). Nurse Oxford saw Plaintiff on March 4, 2014 and referred him to Dr. Hassan. (Doc. No. 106-12). Dr. Hassan saw Plaintiff on March 12, 2014 and requested a dermatology consult to assess the ear, which Nurse Oxford submitted to URB that same day. (Doc. No. 106-4). Defendant Oxford was no longer involved in Plaintiff's medical care or treatment after April 2014.

Plaintiff has failed to show that a genuine dispute of material fact exists with regards to Defendant Oxford's alleged deliberate indifference. Defendant Oxford's affidavit and the undisputed medical records demonstrate that Plaintiff's concerns were timely addressed and that

Defendant Oxford referred him for appropriate care each time she was involved in his case. He fails to demonstrate that she knowingly exposed him to any risk of harm through her actions or inactions. See generally Farmer, 511 U.S. at at 837 (a person is only deliberately indifferent when he disregards a risk of harm of which he is aware); Rich, 129 F.3d at 338 (prison official was not deliberately indifferent even though he had actual knowledge of facts from which a reasonable person might have drawn an inference that defendant's actions exposed plaintiff to a substantial risk of serious harm because he did not actually draw the inference). Therefore, her Motion for Summary Judgment will be granted.

**(C)**      **Defendant Jackson**

Plaintiff alleges in his unverified Amended Complaint that a pre-cancer on his left ear became ulcerated and extremely painful and swollen while he was at Brown Creek C.I. (Doc. No. 24 at 5). Plaintiff put in a number of sick call requests asking for treatment. A doctor at Brown Creek C.I. wrote a medical order for Plaintiff to be seen by a dermatologist, but Superintendent Jackson refused even though Jackson knew of Plaintiff's serious medical need.

Defendant Jackson has submitted an affidavit stating that, as Correctional Administrator, he was not responsible for providing clinical health care to inmates, was not responsible for clinically supervising any clinical or medical health care providers at the facility, has no formal medical training, and was not personally involved in the decision-making process or otherwise involved in the URB. He is unaware of any medical staff intentionally preventing or delaying Plaintiff's medical treatment or being deliberately indifferent to his serious medical needs. Plaintiff did file a grievance on June 28, 2014, in which he alleged that the medical department at Brown Creek C.I. was deliberately indifferent to his serious medical needs. The grievance was investigated and it was determined that Plaintiff was seen by the medical department for his ear on

March 4, 2014, and was referred to be seen by Dr. Hassan. Dr. Hassan requested a dermatology consult on March 12, 2014, and a UR request was submitted by Nurse Oxford. On May 19, 2014, photographs were sent at Dr. Stover's request. Dr. Stover denied the URB request for a dermatology consult. The Step One grievance response noted that Plaintiff had been prescribed Efudex and that Plaintiff had not resubmitted a sick call appointment request indicating that he was having continuing problems or pain. At Step Two, the Step One response was confirmed. The Step Two investigation noted that Plaintiff was examined and was given appropriate medication, and that his URB request was timely processed. At Step Three, the Step One and Two responses were confirmed.

Plaintiff has failed to demonstrate the existence of a genuine dispute of material fact with regards to Defendant Jackson's alleged deliberate indifference either with regards to his personal actions or inactions, or through his role as supervisor. The undisputed medical evidence shows that Plaintiff received continuous and appropriate medical treatment for ear. It is undisputed that Defendant Jackson was not personally involved in Plaintiff's medical care. See Formica, 739 Fed. Appx. at 755 (affirming summary judgment for jail superintendent because who was insufficiently involved in the conduct of which plaintiff complained); Banks v. Gore, 738 Fed. Appx. 766 (4th Cir. 2018), certiorari petition docketed January 3, 2019 (where there is no direct evidence that the prison official actually knew of and disregarded a serious risk of harm, the risk must be so obvious that actual knowledge can be inferred from its mere existence). It is also undisputed that Defendant Jackson was unaware of any deliberate indifference by medical staff. See generally Greeno v. Daley, 414 F.3d 645, 655-56 (7th Cir. 2005) (a jail official's failure to take further action once he had referred the matter to medical providers cannot be viewed as deliberate indifference); compare Cokley v. Townley, 924 F.2d 1051 (4th Cir. 1991) (vacating summary judgment in favor of a

correctional officer where the officer called the nurse and followed her instructions by providing ice after learning of prisoner's injury on a Friday afternoon, then ignored his continued complaints of pain until Monday when the hand was x-rayed and found to be broken). Moreover, any claim with regards to Defendant Jackson's role in denying Plaintiff's grievances provides no basis for a § 1983 claim. See Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994) ("the Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by a state."). Therefore, Defendant Jackson's Motion for Summary Judgment will be granted.

**(D)**     **Defendant Stover**

Plaintiff alleges in his unverified Amended Complaint that, when Brown Creek C.I. staff asked permission from the URB to treat Plaintiff's cancerous ear, Dr. Stover refused. (Doc. No. 24 at 7).

Defendant Stover states in his affidavit that Defendant Oxford submitted a URB request on March 12, 2014. In response to Nurse Oxford's URB request, and as part of his duties as a Medical Consultant and utilization review physician for NCDPS, Defendant Stover requested that photographs be taken of Plaintiff's left earlobe. The photographs were posted for viewing on May 19, 2014. "Based upon [his] medical background, training, education, experience, and the information provided … in the URB request, including the photographs of Plaintiff's left ear lobe, [Defendant Stover] denied the request for a dermatology consultation. (Doc. No. 106-30 at 5). Defendant Stover assessed Plaintiff's earlobe as showing some "mild actinic keratosis" and suggested treatment with Efudex, which is a topical cream which blocks the growth of abnormal cells that cause precancerous and cancerous skin growths. (Doc. No. 106-30 at 5). Plaintiff had previously been diagnosed with actinic keratosis on his right hand and chest and had previously been treated with Efudex cream. Defendant Stover is not aware of any other interactions involving

Plaintiff's care and treatment of his left earlobe. Defendant Stover never clinically treated Plaintiff at any NCDPS facility including Brown Creek C.I., and Defendant Stover was never deliberately indifferent to Plaintiff's serious medical needs, including the care and treatment of his left earlobe. Defendant Stover is unaware of any medical staff intentionally preventing Plaintiff from receiving his medical treatment or being deliberately indifferent to his serious medical needs. Dr. Stover is also unaware of any healthcare provider who intentionally delayed providing medical treatment to Plaintiff.

The undisputed medical evidence and Defendant Stover's affidavit demonstrate, at most, that Defendant Stover was negligent for denying a request for a dermatology consultation and recommending medication to treat Plaintiff's ear. Inaccurate diagnosis and Plaintiff's disagreement with the prescribed course of treatment are inadequate to demonstrate deliberate indifference. See Miltier, 896 F.2d at 852; Scinto, 841 F.3d at 225. Therefore, Defendant Stover's Motion for Summary Judgment will be granted.

**(2)    Sovereign Immunity**

Plaintiff does not appear to seek damages against Defendants in their official capacities. See (Doc. No. 24 at 3). However, to the extent that Plaintiff does attempt to seek damages against Defendants in their official capacities, this is barred by sovereign immunity. See Almone, 478 F.3d at 106; Hutto, 773 F.3d at 549. Therefore, Defendants' Motions for Summary Judgment are granted on this basis.

**(3)    Qualified Immunity**

Defendants argue that qualified immunity shields them from damages in their individual capacities because Plaintiff has not made out a violation of a clearly established right, and their actions were reasonable.

36

Defendants' affidavits and the undisputed medical records show that Plaintiff requested medical treatment on a number of occasions and, each time, promptly saw a health care provider and received treatment. Plaintiff has failed to demonstrate that any of the Defendants acted with deliberate indifference or violated any clearly established right. See Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 306 (4th Cir. 2004) (reversing denial of summary judgment for officer defendants under qualified immunity analysis where there was no evidence suggesting that the officers recognized that their actions were inappropriate under the circumstances); Deck v. Rubenstein, 2016 WL 2726543 at *5 (N.D. W. Va. April 13, 2016), *report adopted* 2016 WL 2636300 (N.D. W. Va. May 6, 2016) (warden and department of corrections commissioner were entitled to qualified immunity on plaintiff's allegation that they "rubber stamped" his grievances and failed to intervene when he complained about his medical care because they had no involvement in direct day-to-day responsibility for health services and plaintiff failed to specify any direct acts taken by either defendant that violated his constitutional rights).

Therefore, Defendants are entitled to qualified immunity and their Motions for Summary Judgment are granted on this basis.

## IV.    MOTION TO COMPEL DISCOVERY

Plaintiff has filed a Motion to Compel Discovery dated January 13, 2019 in which he argues that he has not received his copy of the discovery documents cited in the Protective Order entered on October 24, 2018. See (Doc. No. 89). Defendants have filed Responses explaining that no documents are being withheld pursuant to the Protective Order and that Plaintiff has been served with complete discovery responses. (Doc. No. 109).

The court has "wide latitude in controlling discovery and … [t]he latitude given the district courts extends as well to the manner in which it orders the course and scope of discovery." Ardrey

v. United Parcel Service, 798 F.3d 679, 682 (4th Cir. 1986). A scheduling order may be modified "only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "Good cause" means that "scheduling deadlines cannot be met despite a party's diligent efforts." Dilmar Oil Co. v. Federated Mut. Ins. Co., 986 F.Supp. 959, 980 (D.S.C. 1997) (citations omitted).

Plaintiff's Motion is moot for the reasons set forth in the Defendants' Response. See (Doc. No. 109). In addition, Plaintiff essentially asks to reopen discovery which closed on November 16, 2018 but has failed to demonstrate good cause for doing so. See (Doc. No. 70). Therefore, Plaintiffs Motion will be denied.

## V.    CONCLUSION

Based on the foregoing, Defendants' Motions for Summary Judgment are granted, Plaintiff's Motion to Compel Discovery is denied, and this case will be closed.

**IT IS, THEREFORE, ORDERED** that:

1. Defendant Coffey's Motion for Summary Judgment, (Doc. No. 102), is **GRANTED**.

2. Defendants Jackson, Oxford, and Stover's Motion for Summary Judgment, (Doc. No. 104), is **GRANTED**.

3. Plaintiff's Motion to Compel Discovery, (Doc. No. 108), is **DENIED.**

4. The Clerk of Court is instructed to close this case.

Signed: February 5, 2019

Frank D. Whitney
Chief United States District Judge